We want to thank you all for being here with this kind of weather conditions and still making it at court, so thank you. And I'd like to thank your mothers for having you and the people who built your safe cars. So please proceed. Do you want to say anything about Judge McDade? Oh, go ahead and come up. Don't start the time yet. Judge McDade is under the weather. She's a member of this panel. She will be participating in the resolution of this matter, but she couldn't be here for a while. May it please the Court, the Justices, and the State. I represent Mr. Tondini in the appeal of this case. The underlying facts of this case are relatively straightforward. Mr. Tondini was charged with several counts of aggravated battery. And the facts that were introduced at trial were that Mr. Tondini was a patient of a bar. As he exited the bar, the door slammed shut. The owner of the bar confronted him in the street. Contemporaneous to that confrontation, three individuals who weren't related to the owner at all, Mr. Tondini, approached him. Some verbal or physical altercation ensued, and Mr. Tondini used a pocket knife and stabbed one of the individuals in the chest. He was arrested with these offenses charged. The matter proceeded to jury trial, and he was found guilty of aggravated battery in a public way. Aggravated battery with a deadly weapon, but not guilty of aggravated battery at the time of trial. The issues for this appeal are as follows. The first is whether or not the Court here, in denying his motion to strike a juror for cause, used the fact that the juror on the question was actually married to an employee of the State's Attorney's Office that was prosecuting the case. The other issue is whether or not the trial court used its discretion in denying the defendant's attempt to allow an expert to testify as to issues relevant to the self-defense in this case. Just dealing with the issue of the jury selection, the record is relatively straightforward. As the Court was proceeding to the court, an individual by the name of Little began to answer the questions, and it came to the Court's attention that this individual was married to the victim's coordinator of the Hancock County State's Attorney's Office. He had indicated that he had been in the office several times. He goes there two times a month. He indicated that he actually knew the State's Attorney of Hancock County, the State's Attorney Coroner, who was actually the State's Attorney who was trying the case on behalf of the people. It was not insisted that he was the actual official that was the one who was the trial attorney for the State in that matter. He ultimately didn't indicate anything in his questions that he would be biased at all against the State. He indicated that he would be fair and wouldn't necessarily consider his relationship with the State's Attorney's Office or his wife's employment there as something that would adversely affect his ability to sit on the jury. As the selection process proceeded, the Court ultimately denied a motion to strike Mr. Little for cause that was made by the defendant. The issue is basically too close of a relationship. The Court denied the motion for cause without any comment, and then the way that the selection was proceeded is after the motion to strike for cause was denied, the panels were then moving back and forth at that point. I think eight jurors had been selected by that point, and it boiled down to the defendant making a choice between using his last remaining peremptory on a police officer or a retired police officer who knew one of the officers who was a witness in the case and had some contact with the Hancock County State's Attorney's Office, or to keeping Mr. Little in the jury panel. Ultimately, the defense counsel chose to strike the police officer. Mr. Little was seated, and then ultimately... And that happens in trials all the time, right? I mean, there's only a limited number of challenges you can have to strike someone, and then there's the cause. Yes, that is correct. But sometimes there are hard choices that are made. Sometimes there are, yes, but I think the issue is in this case is that the defendant, because he had used his peremptory challenges for earlier jurors, was faced with an impossible decision because the court denied the motion for cause. He then has to choose between the police officer. For its own reasons, they're not palatable to the defense side of the case. But alternatively, you choose between... When they first looked at Little, how many preempts had they used? I don't... I think when... I don't know. I can't break it down that way. I don't know if they were questioning in panels of four and then doing their back-and-forth, or if they went through an entire large panel of, let's say, 12 or 15 jurors and then started picking in panels of four. See, the point I'm making is after they talked to Little, there were other preempts used after Little was talked to, right? I think, if I understand your question... It wasn't until the last minute. You know, you've got Little still on the jury. Right. So it wasn't a last-minute situation that it was a choice between Little and a police officer. There had been other... After Little was interviewed, weren't there other... I think... And so, just so... I believe what had happened was this is when the jury panel was all interviewed, they were all interviewed, the issues with Little kind of came out. There might have been some further questioning of Little after, like, the general panel was done. And then the parties started to pick their individual panels. And so I would rely on the record, but I believe that defense counsel knew that Mr. Little would be coming down at some point, but still used... And knew about Little. Right. And still used some other preempts on other people. On earlier people in the panel, yes. Right. And so he used his peremptories. I think he had five since he was looking for seven. In the felony case, I think he used five, and then for six up to that point. And then he now is the last panel that needs to be picked. I think what the discussion was, it ended up going down for him to choose between either Mr. Little being stricken for a peremptory or striking the police officer for a peremptory. I guess my question then is, Little could have been stricken earlier. No. No? The panel that... What had happened was when the opportunity came to strike Mr. Little for cause, he was denied, and then immediately thereafter it was, all right, now here's the panel to the state, and here's the panel to the defense, and then the final peremptory was used on the panel. Am I wrong? Wasn't Little interviewed earlier? Yes. Okay. So all these people were interviewed earlier. Yes. And the defense could have preempted, challenged some people earlier, right? Are you suggesting in an out-of-order fashion, or... So they interviewed everybody, and then that's when they did the panels before. Yes, and so Mr. Little was in a later panel. He was not in one of the earlier panels. So even though they knew about Little, he wasn't in one of the first two panels. Correct. Or first three panels. Correct. How it worked out, I know that a number of challenges were used by both sides before we got to the panel of Mr. Little.  And I would understand, I think, what Justice Carter started off by saying, because that's not an entirely unlegal situation. There are situations in which there are people on a jury panel where there might be the implied bias that they carry. The best example is a police officer. That's what this case, you've got a police officer. Or the alternative is someone who has a negative opinion of the state or has prior criminal contacts or something like that. That could be a person with an implied bias against the state. But what makes this case a little bit more unique was that while the trial was proceeding, it is our position that Mrs. Little, the victim-witness coordinator, was actually more involved with the prosecution than maybe the parties had originally thought, either purposefully or accidentally. We submitted, or as part of the post-trial proceedings, the original trial counsel submitted an affidavit where it indicated that she sat approximately 15 feet away from the jury box and that on at least one occasion she handed these state's attorneys documents as part of, for whatever reason she did. And so it is our position that it is more than just the fact that there's this relationship that exists. There's at least this kind of taint based on the fact that Mrs. Little is actually involved in the trial of this case. Certainly as the victim-witness coordinator, she's getting witnesses in a court, getting witnesses out of court, arranging their schedules, letting them know what's going on, getting them prepared. But for her to physically be present in the courtroom, seated so close to the jury, I think creates kind of an issue. And I believe it should have been an issue that should have been safeguarded against during the initial picking procedure. You make some good points, but let me ask you this. In a felony trial, does the trial judge have the discretion to allow additional perundering? He does, Your Honor. But one of the things for the judge to exercise that discretion is somebody has got to ask him or her to do it. Right. Did anybody ask the judge, hey, could I have some additional perundering? No, Your Honor, and I'm not going to sit here and say that issue is appropriately addressed. What I will say, though, is this. If you read the record, it's within like three pages of each other, two pages of each other on the record. The motion for cause is denied without comment. And so now an attorney is sitting there and thinking, well, do I keep the cop or do I keep the husband? Who chooses the cop? I guess what the court is now saying what he should have done then at that point is say, Your Honor, give me one more perundering because you're forcing me to accept the husband because you wouldn't strike him for cause. But just like the judge has discretion on whether or not to strike for cause, he also has the same discretion on whether or not he should grant the perundering. And at that point, it's almost a function, a form versus function. I don't think that the fact that he denied the motion to strike without cause, without any comments, without saying that he could be fair,  without putting something out there doesn't necessarily raise the mind of an attorney that making that request would have been granted. If the judge probably was in a position to grant that additional perundering, then why go through that kind of process in the first place? He knew what he was going to do with the additional perundering. He should have just struck him for cause. So I don't think counsel should necessarily be completely faulted for that, especially given the fact that there were earlier motions for cause which were denied without comment. There were other issues where, you know, if defense counsel has a feeling that he's not going to do it, is there a point to him making the request beyond perfecting the record? And part of the issue is why I don't want Your Honors to hold that as against him as it could is that he may not have known that this is the little man who's sitting in the court during the trial. And so at that point, when she's more involved in the case, that's where those problems become. Do you know she was involved in that particular case? Yes. That she was giving stuff to the state attorney about that case. You know that for a fact. This will be an issue of dispute, I presume. When we were doing – I was on trial counsel. We were brought in to do post-trial motions. The original co-counsel on the case submitted an affidavit where he indicated that Mrs. Little was present in court, seated 15 feet away, and that on at least one occasion he recalls her handing papers to Mr. Thornt during the trial. And that's my point. Are the papers related to this case? I – without – since there was no evidentiary hearing into that, I can only speculate that they were since this appears to be a very small county. It all appears to be that this was the only case that was going on at the time. And whether or not the affidavit was specific enough to say, like, it was when the jury was in session or during a time when the case was in front of the bench, I don't know if the affidavit was specific enough. Let me back up. The spouse is part of the state attorney's office? Yes, she's an employee, yes. And who was trying the case? The state attorney. Okay. And as an employee of the state attorney's office, she gives some sheets of paper to the state attorney? Yes. And we have no idea if that's part of this case or not? I guess there's always a possibility that she was doing something unrelated to this particular case that required any documents from the state attorney. But since it happened during the trial, presumably in the presence of the jury, it creates an influence in the jury's mind. And it's certainly Mr. Littles and his wife. Was she identified to the other jurors? When the law hearing was taking place, it was in front of the entire panel where the question was asked if they know anyone at the state attorney's office. Mr. Littles raised his hand, and I think the judge said, Is your wife Sandy Littles? And the answer was yes. And I think at least a little bit of information came out that she was an employee of the state attorney's office. And additional information about his contact with the office, his visits with the office may have been outside the presence of the jury. But I'd have to rely on the record to know that jury selection is a critical process. I mean, she wasn't pointing out, like, there's the spouse right there. Yeah. Two minutes, please. So, Judge, to be honest, I would ask you to consider that when you consider some of the law in these cases, is that I understand there's not a pro se rule against having government employees on the jury. But I think a great bulk of those cases deal with the idea of a police officer or some other government employee being on the jury panel. I don't think that they touch to the degree of relationship between an employee of the office as well as the fact that the person who's trying the case is, in fact, the employee's boss. Somebody can say all day long that it wouldn't affect me at all, but any realistic husband would be thinking about that. The other issue, obviously, is that the court denied my client's request to have an expert testify during the case. And I would argue that the biggest issue with that is the court considered the testimony in this case to be scientific in nature. And as a result, it had to comply with Rule 702, that if the evidence was scientific in nature, it needed to be generally accepted in the community, of the scientific community. However, the case law says that if the evidence is not scientific in nature, that if it's evidence that is obtained through observation and experience, those sorts of tests do not apply. The general acceptance test does not necessarily apply. The scientific community standard does not apply. The issue then becomes is, does this person have knowledge beyond that of an ordinary citizen? And I would compare the expert in this case, Mr. Mathieu, to that of a state narcotics expert or a state gang expert. Well, a state narcotic. What were this guy's qualifications to get these patents? I guess the biggest qualifications would be his kind of, I wouldn't use the word formal education, but his training in martial arts and self-defense, and then his application of those techniques in training various personnel, including civilians, police officers, and military personnel, and basically doing this for his entire career. Just advancing himself through the understanding of martial arts and use of force, and then teaching officers the appropriate use of force in given situations. Teaching military personnel the appropriate use of force in given situations. So it's more of a practical experience. Just like an officer's going to say, this amount of cocaine is for personal use, this amount of cocaine is more likely indicative of possession of the patent. He didn't take the cocaine. He doesn't know what cocaine had to do with it. Let's get specific about this expert. He's talking about violence dynamics. Right. Is that about psychology, or is that about teaching martial arts? I understand that it's more of a buzzword, I think, to kind of incorporate everything that he talks about. But what is it really, what he's going to say, is it about psychology? No. Which he doesn't have a degree in. Correct. Or is it about how to operate martial arts, how to do it? I think the term violence dynamics essentially refers to what force is useful or appropriate for a given condition, and what to consider when deciding what type of force to use in a given situation. And, Laz, let me ask you, in his testimony, had he been allowed to testify, what would have been exactly why? He would have testified as to the issues related to the case, as to why it was objectively reasonable for the defendant to believe that he needed to act out of self-defense. So some of the facts of this case are as that. I guess what I'm going at, was there an offer of proof as to what his testimony would have been, had he been allowed to testify? Well, his C.E. was part of a very extensive motion practice where he did testify. And so his opinion was actually put in as part of the evidence for the judge to consider. I don't think during the actual hearing where Mr. Mathiam testified, he was ever asked the golden question of, what is it that you would tell us if you had given him a chance to tell us? But I think his opinion, if you read through it, and I cite to it in my brief, there are different pages where he points out that when confronted with three individuals, these are the kind of issues that need to be worried about. There's information or indications that the individual may have had beer bottles or beer mugs in their hands, which could have been used as weapons. And so there was also issues related to size disparity. Mr. Tempe was described as a small man. Two of the individuals were actually very large men. The third individual was a very large woman. She was about 5'8", a heavier woman. Related to the concept of self-defense. How does that relate to the concept? That's why they wanted him, right? Right. To say, look, these are the things that a person would normally and ordinarily consider. That if I was teaching someone and they were confronted with three individuals, these are some of the things that they should be considering. If I was teaching a police officer, if three suspects or three people had come up to them, these are the things they need to be considering. So when we talk about self-defense, there's not only the subjective belief that a person receives self-defense, but the objective belief that such force is needed. Well, but is that really beyond the canon of the average person? In other words, does the average person understand that if I'm confronted with three violent individuals, some of whom are bigger than me, that I might, to save my bacon, I might have to use deadly force as to the force I would generally use if I were confronted with somebody my size or smaller or something like that. There is a possibility of that, but I think part of the issues are the facts of this case, which is that Mr. Tandini is suffering injuries as a result of this encounter with these individuals, that these individuals are not actually abusive, of physically engaging him first. Well, we're threatening, but as soon as you get a threat, you know, sometimes you may figure out you need to strike first because if one of them gets a shot in first, you're... Well, I think that's a good point, Your Honor, but I think if you look at the records of this case, one of the things that the state's attorneys did in his closing argument was basically call Mr. Tandini out for stabbing a woman. Well, why would he do that? Why would an expert come to the court and say, well, when confronted with these three people, he made a decision to try to defend himself, and that's the decision that he made. You know, those are the things that they could add something to. And beyond that, the standard is not whether or not it's within... that the issue of self-defense is within the capacity of the ordinary citizen to understand. The question is whether or not the expert is allowed to testify. Does he possess information above an ordinary citizen? The court can deny this based on the fact that the woman is a citizen of the jury. The court can deny this based essentially on the issue of lack of acceptance in the scientific community of what Mr. Mankiewicz has to say. So the court's talking about a relevancy issue, I think. I don't think you question that. And, of course, at the end of the day, we review a judge's decision. His ruling, not his rationale for getting there, right? Yes, I believe for this particular issue, it's whether or not he abuses discretion or not. Well, sir, any further questions? Thank you, Mr. Patel. Mr. Oswald. Police Court. First issue defendant argues that the trial is adjourned allowing the spouse of an employee of the State's Attorney's Office to serve on the jury. As part of his motion for a JNOB or for a new trial, the defendant filed an affidavit attesting that James Whittle was under the mirror and that his wife, Sandy, was the victim witness coordinator working for the Hancock County State's Attorney. The defendant claimed that Sandy assisted the prosecutor during trial. Prosecutors filed an opposing motion that Sandy made sure that the witnesses were in the right place when needed for trial. Sandy's not an attorney. She did not assist in the prosecution. She did not sit at the counsel's table or engage in conduct that would give the perception that she was involved in the prosecution. Well, if you don't have witnesses, you don't have much of a prosecution, do you? Well, I would guess that would be true. I mean, she coordinated all the witnesses. Correct. She made sure they were in at the right time. So that's coordination of all the witnesses? Yes. And that was admitted to by the State's Attorney? Absolutely. No denial. But I believe what the State's Attorney was saying, but did not assist, was sit at the counsel's table and actually participate in the prosecution. She wasn't a lawyer, but she made sure all the witnesses got in. Absolutely. That's correct. That was her role. But even if Sandy had been seated within 15 feet of the jury box or handed some documents to the State's Attorney, as the defendant was claiming, this would not have revealed that the liberal himself was biased or it would not have overcome his responses on what he heard that he would be fair. There's no per se rule that excludes jurors based on their relationships with the persons connected with the trial. In his reply brief, the defendant asserted he did not have a peremptory challenge. For me, it is his last one on Harry Douglas. Little and Douglas were on the same panel before. At this point, counsel already used six of the seven peremptories. The judge denied counsel's motion for causes to vote, and then he used his last peremptory not to strike Little, but to strike Douglas, who was a retired ISP trooper who had supervised a prosecution witness, though Douglas also said that he could be fair in reviewing his case. The defendant did not request more peremptory challenges, so he clearly wanted to strike both Little and Douglas. Well, there is something to the argument that if the cause motion is denied, why would the judge let him have another peremptory? I mean, letting him have another peremptory is in essence saying, okay, I know you want to do this for cause. I'll give you another peremptory if you can do it that way. Well, you could say to the judge, you know, I don't have any more peremptories. You've denied my cause. You know, he could have potentially used the cause motion against Douglas, but he didn't use his peremptory. Then he says, I've got an objection to it because of this reason. I don't want him on the jury. He's related to this person. I know, but, you know, if he denied the cause motion, it might be futile to ask for another peremptory. For the same person. Possibly. Trying to dump the same person. You're not talking about, you know, another, the next panel, another panel if there was a possibility of another panel. And all of a sudden something else surprising comes up. It wasn't like that. It was this panel. Right. Again, he could have made that. The judge could have exercised discretion to go ahead and give the peremptory after some discussions, some argument made on that, but there was no attempt even to get the peremptory. He did not remove, renew his motion for cause of inappointment, and he didn't ask to have the alternate seated on the jury in place at all. The voir dire little said he knew the state's attorney because Sandy worked in the office. Little said Sandy's appointment, employment, would not prevent it from being error impartial. Sandy had not spoken to Little about the case. Little denied that his acquaintance with the prosecutor would lead him to rule in favor of either pardoning. Little affirmed that he would listen to the evidence and decide the case based on law. Defendant's counsel challenged Little for cause based on a persistent appearance of inappropriate. In his reply brief, the defendant cites Marston v. Kipfer, but unlike in this case, the two jurors that issued in that case had a personal relationship with the defendant, who was the treated physician. He also discussed people in Boston, and he asserts that unlike in Boston, the trial judge did not ask specific questions of Little, but the trial judge did question Little about his relationship with Sandy and the state's attorney, and that's on the order preceding pages 3 through 83. The defendant asserted that the judge did not make findings at the hearing. The post-trial motions regarding Little being candid and straightforward as did the judge in Boston. The trial judge reviewed the record of his voir dire of Little's trial. The judge noted that the defense counsel then questioned Little, and the judge found there was no indication that it couldn't be anything other than fair and impartial. His main jury defendant acknowledged that Little did not say he would be biased against the defendant. The defendant complained of claims implied bias and noted that a common law juror was presumed biased if he or she were related to a party, but Little was not related to a party, so he's not presumed biased even under common law, and even Sandy had handed documents to the state's attorney during the trial. The defendant claimed that when the state's attorney denied it, she was not a party to the trial. The court, the Illinois Supreme Court, stated that the suspicion of bias is not evidence of bias, and the 4th District and Cobb held that it was property of the father of an assistant state's attorney who signed the information in the particular case to serve on the jury. Jurors would be removed if they are biased against a party that the defendant has not shown any bias. The people are eager to waive this issue because he did not object to the denial of his challenge to Little, he did not challenge Douglas for cause, he did not ask for an additional primary challenge or argue to the trial judge that he was being forced to accept the objection of the jury. And his reply brief, the defendant claims this issue may still be reviewed despite the waiver because the defendant has a fundamental right to a fair trial. But the 4th District and Bowen stated that the defendant raised for appeal the decision not to remove a juror as it is an affirmative act in the absence of his or her jury service. And the people ask, as to this issue, the defendant has waived this issue and alternatively we ask this court to find a trial judge to... Well, they raised it in their post-trial book, was it raised? Are you asking that it was forfeited in this case or waived? Yes, because of the fact that at trial he did not ask for additional parenteries and a reunion for the... Okay, I mean, for generations people whose motions for cause have been denied and if they preserve it, which was preserved here right in the post-trial motion. Yes, he did, but at the time of trial he didn't ask for additional parenteries or he didn't raise another objection, he didn't try to get the additional juror, the alternate to be placed on the jury. He did nothing other than he used his last parentery on Douglas to sit him on the loop. After trying to get him off for cause. Right, right. And so there's case law that says that in these situations that despite me having the motion for a new trial that it would still be a waiver and we cited that in the... So we'll stand on a brief issue and any other argument on that at this point. I'd like to move on to the second issue if you have no further questions about the first issue. So the trial juror in denying his motion to qualify, Mark McKeown is an expert witness. McKeown's proposed testimony was unnecessary, it was irrelevant because it would not have assisted the jury to determine whether the defendant acted himself. The juror could understand the facts and draw conclusions from these facts including whether the defendant acted in self-defense without the aid of... Well basically he got a martial arts expert, right? Pretty much confirmed his own statements. So that could be from, you can establish that kind of expertise by experience. I believe that would be accurate, sure. I mean, we have people who've either taught that in the military or taught that to police departments and they've become experts in martial arts, right? Sure. So evidently he's, from the record it appears he's an expert in martial arts. Apparently from his CV and discussions at trial, he proclaims himself to be an expert in martial arts. And so he tried to testify in this case about the need to use a knife basically. The need for self-defense. Yeah. Right. To use a knife under the circumstances of this hearing. He wasn't at the particular incident, so he would not have any Christian knowledge of... I mean, when you can use a knife in self-defense. He said that he specifically said he was not an expert in self-defense. He was not an expert in the legal concept of self-defense. But in a fight, the degree of force you use, that's what he was going to testify about. That was my understanding. Answer that. The issue that related to was the self-defense issue, wasn't it? It was. That's what he was trying to present him for self-defense. McGinn is not a medical professional or scientist. He has no degree or certification in any field. He denied being an expert. He has no training in investigatory procedure or in the review of the scientific process. He's not testified as an expert in the legal concept of self-defense. He's not a member of any professional organization. He and two other... But he wasn't put up to be a scientific expert, was he? No, no. I mean, we have experts. We have other kinds of experts, lay experts in all kinds of areas. Sure. I mean, police officers, I think it was mentioned earlier, through their experience... They're not scientists. Correct. And the judge said that... I mean, Mr. McGinn said specifically this was not a scientist. And the judge stated that the fraud test was not applicable because there's no indication that there was any scientific evidence that was going to be offered. So, the judge did not rule based on the disc of science in that respect. Your Honor, I'm just going to stand on my brief or any other argument on this one also and ask that you affirm the trial judge's decision. Thank you, Mr. Oswald. Mr. Patel, some rebuttal. Your Honor, turning to what the State opened with, how the State at the trial level essentially disputed what Ms. Young did, there was nothing in the pleadings that disputed that she was not a murderer. There was nothing in the pleadings that disputed that she was not 15 feet away. And I understand what the State's attorney was trying to argue, and I think we're not assisting in the prosecution. She wasn't making objections. She wasn't arguing witnesses. She's not a lawyer. But to say that the victim witnessed a coronator who's not assisting in the prosecution, Your Honor, I think is really kind of diminishing as to what her role really was. And certainly if her job is to get witnesses in and out of court before they make their schedules, she could just open the door for them, let them go in the courtroom. She doesn't have to go inside. I have to imagine that at the end of the jury selection, when it was done, Mr. Forms ringing ear to ear on the inside saying, how did I get this person on my jury? Just like I, as a defense attorney, would be grinning if I get three convicted felons on my jury. And... Well, with three convicted felons on your jury, you might get a hung jury. And the... On this evidence before us, what's the likelihood, do you reckon, that any jury would have found the defendant not guilty? I think what's interesting about this case is that despite Mr. Matt Young not being allowed to testify and despite the defendant not testifying in this case, the court still felt that the evidence was compelling enough to give a self-defense instruction. I'd also point out that she got, my client got acquitted of one of the charges. There were photographs. The victim showed the scar that she had, which was kind of above the breast. She had to go to the hospital and receive stitches. But I think there was probably some disputes as to what took place. I think also the case takes on a different dynamic if Mr. Matt Young is allowed to testify. But the issue with the implied bias is that, and we'll never know, but if you take on the jury for a year to the door and see it, the jury is giving more weight to Mr. Little's opinions versus not, or the jury is somehow swayed by his position or not. And so the issue is not whether or not the trial would have turned out differently. The issue is whether or not he had a fair trial to begin with. Who do you think would have been not let Mr. Little sit on the jury? This is really a case about implied bias. And I think when you take a look at the different cases that are cited here and the briefs in this case, there is certainly a trend in the federal court system to say that when you have these higher levels of implied bias, when there is a relationship between the juror and someone involved in the case, prudence dictates to not allow that person to sit on the jury. There's certainly a lot of dicta in some of the cases that both sides rely on. In, I think, the Green case, which is when an employee of the juvenile section of the state's attorney's office was going to be put up there, or I think in, I don't remember the name of the case, but it was the one where a judge had her husband on the panel and was actually allowed to sit in the jury for the trial. The courts made these commentaries, which is, this is not a case law in this area, because it's not coming up for appeal because the judges are striking these people, because that's kind of what prudence and common sense would dictate. Even in the Cobb and the Cole case, the Cole case specifically says that they would give, even though they found in favor of the state, they still gave the issue serious consideration. And I think while there shouldn't be a per se rule to suggest that she is not a party to the case, my argument for that would be that in a criminal case, certainly Mr. Tondini is a party, and while the other side is the state of Illinois, the only person who's calling the witnesses is Mr. Horan. The only person who's filing the charges is Mr. Horan. For lack of a better word in a criminal case, that state's attorney's office is the party. And I don't really see that argument carrying the day in this. One minute, please. As it relates to what counsel brought up for Mr. McYoung, I do dispute that, whether or not he would have assisted the trier effect, as I indicated earlier. The fact that he wasn't present at the incident is not unusual for an expert. I talked about how an expert in psychology would testify that someone suffers from Battery Scott syndrome. Well, they didn't witness the murder take place. They weren't there for any instances of domestic violence, but they meet with the individual, they review records, they make a diagnosis, and they give an opinion poll. So the fact that Mr. McYoung wasn't physically there to see what took place goes to a weight, not a disability. Mr. McYoung didn't say he was not an expert. When I was in law school, they taught us that for an expert to get on the stand and say, yes, I'm an expert, is hubris, because it's a judge's job to decide whether or not someone's an expert or not. That's a conclusion, not a fact, right? Right. And I think that his response of, I'm not an expert in self-defense, is more the colloquial way of saying that particular thing. And I don't think he was tender to be a legal expert in any legal concept. He was tender to be an expert on whether or not a person can use force to defend oneself. This is something we call self-defense. Certainly legal self-defense has its other considerations, but for him to talk about what factors are appropriate to use when faced with a type of force or a threat with the use of force, that's where his expertise would come in. And while he is a martial artist, I think you see his ability to be an expert when he teaches police officers what force to use. Certainly in these times when police officers are under great scrutiny for the force they use, they're not just going at anybody with a weapon and saying, okay, you're a black belt in karate? Well, teach me some moves. That's not how it goes. They want to know what force to use to counteract the force used against them. Are there any further questions? No. Thank you, Mr. Patel. Mr. Oswald, thank you also. We'll take this matter under advisement. As I indicated at the outset, Judge McDade will be involved in this matter and a written disposition will be issued. Right now we'll be in a brief recess for a panel change.